IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CAPLIGHT TECHNOLOGIES, INC., Plaintiff, v. NASDAQ PRIVATE MARKET, LLC and MARC PERKINS, Defendants. | Case No. ______________ **DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Caplight Technologies, Inc. ("Caplight" or "Plaintiff"), by and through its undersigned counsel, alleges as follows against Defendants Nasdaq Private Market, LLC ("NPM") and Marc Perkins ("Perkins") (collectively, "Defendants"). Allegations concerning Caplight and its own acts are made on personal knowledge; all other allegations are made on information and belief.

## NATURE OF THE ACTION

1. This is an action for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. ("DTSA"), the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq. ("CUTSA"), the Delaware Uniform Trade Secrets Act, 6 Del. C. c. 20, and for state-law claims arising under a common nucleus of operative facts, including common-law trade secret misappropriation, unfair competition, unjust enrichment, conversion, breach of contract, breach of fiduciary duty, and aiding and abetting the breach of the duty of loyalty.

2. Caplight is a private-market data company that invented and developed a data interpolation platform that generates predictive and interpolated pricing data for private-company securities, where reliable transaction data is scarce, incomplete, or stale. On March 17, 2023,

Caplight filed U.S. Provisional Application No. 63/490,832 (“the ’832 application”) which described confidential aspects of Caplight’s platform. In addition, confidential methodologies, parameters, data, and know-how through which Caplight implements and commercializes that platform are not disclosed in that provisional patent application, and remain Caplight’s trade secrets.

3. Marc Perkins was Caplight’s Vice President of Commercial Products and is one of the four named inventors on the Caplight Data Interpolation Platform patents. As a Caplight insider, and an inventor of the patented technology, Perkins was entrusted with Caplight’s most sensitive, confidential, and proprietary information concerning the design, data sourcing, weighting, modeling, and commercialization of Caplight’s pricing platform. Perkins was personally involved in the preparation of the ’832 application.

4. In the weeks before he resigned to join NPM, Perkins researched methods of moving data out of Caplight’s systems, downloaded and screenshotted Caplight confidential materials, and took steps to cover his tracks, including performing a factory reset on a Caplight-owned computer before returning it.

5. After leaving Caplight, Perkins joined NPM, where he served as “Head of Data and Financial Products, Nasdaq Private Market.” On October 31, 2024, less than one year from leaving Caplight, NPM launched its Tape D® product, a private-market data platform that generates daily algorithmic estimates of private-company share prices (“Tape D”)—the very functionality Caplight pioneered. NPM’s launch announcement identified Perkins by the “Head of Data and Financial Products” title.

6. Tape D was developed by NPM through the improper acquisition, disclosure, and use of Caplight's trade secrets and confidential materials, which Perkins brought with him to NPM. Caplight seeks damages, injunctive relief, and all other appropriate remedies.

## THE PARTIES

7. Plaintiff Caplight Technologies, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business at 575 Market Street, San Francisco, California 94105.

8. Defendant Nasdaq Private Market, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 3 East 28th Street, 7th Floor, New York, New York 10016. NPM operates the private-market data and market-intelligence platform marketed as Tape D®, including through the website www.nasdaqprivatemarket.com and through the Nasdaq Data Link API.

9. Defendant Marc Perkins is an individual who, on information and belief, resides in Brooklyn, New York. Perkins was Caplight's Vice President of Commercial Products until his resignation to join NPM as Managing Director, Head of Data and Financial Products at their offices in New York City beginning on November 27, 2023. Mr. Perkins is currently the co-founder and CEO of Crossbeam Partners with headquarters at 477 Madison Avenue, New York, NY.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over Caplight's DTSA claim under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c), and supplemental jurisdiction over all of Caplight's state-law claims under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claim.

11. This Court has personal jurisdiction over NPM because NPM is a Delaware entity and is therefore subject to general jurisdiction in Delaware. In addition, NPM transacts business in Delaware and has committed tortious acts within Delaware, including by developing, operating, offering, selling, and/or providing access to Tape D within this District, such that jurisdiction is proper under 10 Del. C. § 3104, and Caplight's claims arise out of those activities.

12. This Court has personal jurisdiction over Perkins because he agreed to personal jurisdiction in Delaware for disputes in the meaning, effect, or validity of Caplight's Employee Proprietary Information and Inventions Agreement, which Caplight's Chief Executive Officer, Javier Avalos, signed on December 10, 2021, and which Perkins signed on March 17, 2022.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because NPM and Caplight are Delaware entities and Perkins agreed to venue in this District.

14. [RESERVED]

## FACTUAL BACKGROUND

### A. Caplight and Its Data Interpolation Platform

15. Valuing the securities of private companies is notoriously difficult. Completed transaction data generally represents the most accurate indication of a private company's value, but that data is often unavailable, incomplete, or stale.

16. Caplight addressed this problem by developing a platform that collects heterogeneous data—including completed transaction data, live indicative pricing data such as orders and indications of interest ("IOIs"), public comparable data, and accounting marks—processes and adjusts that data according to its reliability, and models the combination to interpolate pricing and valuation data.

17. Caplight's commercial embodiment, the Caplight MarketPrice®, collects anonymized completed trade records from broker-dealers and institutional investors, supplements them with indicative pricing data normalized to a "mid-market" level, and incorporates accounting marks such as 409A valuations and mutual fund marks.

18. Caplight's platform presents its outputs through an interactive graphical user interface that allows users to visualize price estimates, price ranges, closed trades, bids, asks, 409A valuations, funding rounds, and public comparables over time, and to include or exclude particular data sources by toggling them on or off.

19. The first publication by the United States Patent Office of the subject matter disclosed in the '832 application was September 19, 2024. Three patent applications have been filed claiming priority to the '832 application and these have been granted as U.S. Patent Nos. 12,597,182; 12,243,130; and 12,394,123. In granting these patents, the Patent Office found that subject matter disclosed in these patents was novel and non-obvious.

**B. Perkins's Employment at Caplight and Access to Caplight's Trade Secrets**

20. Perkins was employed by Caplight from July 14, 2021 until his resignation effective November 10, 2023. He joined Caplight as Director of Marketplace Strategy and most recently served as Vice President of Commercial Products. During his employment, Perkins resided in Los Angeles, California. In his roles at Caplight, Perkins was entrusted with Caplight's sensitive confidential information and trade secrets, including the confidential information and trade secrets relating to the MarketPrice system.

21. On July 12, 2021, Caplight extended Perkins a written offer of employment, which Perkins accepted, for the position of Director of Marketplace Strategy, with an employment start date of July 14, 2021. The offer letter required Perkins, as a condition of employment, to sign and

comply with Caplight's Proprietary Information and Inventions Agreement, which requires, among other things, the nondisclosure of proprietary information. A copy of the offer letter and the form of Proprietary Information and Inventions Agreement attached to it that was executed by Perkins on July 13, 2021, is appended hereto as Exhibit A.

22. Thereafter, Perkins executed Caplight's Employee Proprietary Information and Inventions Agreement (the "Agreement"), which Caplight's Chief Executive Officer, Javier Avalos, signed on December 10, 2021, and which Perkins signed on March 17, 2022. The Agreement is effective as of the first day of Perkins's employment and governs over and supersedes any similar agreement Perkins previously signed. A true and correct copy of the Agreement is appended hereto as Exhibit B.

23. In Section 3(a) of the Agreement, Perkins agreed that all "financial, business, legal and technical information regarding or relevant to any Company Interest that is not generally publicly known," including information relating to Caplight's Business Partners, constitutes "Proprietary Information," and that he "will hold in strict confidence and not directly or indirectly disclose or use any Proprietary Information, except as required within the scope of [his] employment." That obligation continues until Perkins can document that the information has become "readily generally available to the public without restriction through no fault of [his]."

24. In Section 3(b) of the Agreement, Perkins agreed that "[u]pon termination of [his] employment . . . [he] will promptly identify and, as directed by the Company, destroy, delete or return to the Company all items containing or embodying Proprietary Information (including all original or copies of content, whether in electronic or hard-copy form)."

25. In Section 4(c), Perkins agreed that, during his employment, he would not "act in any capacity in or with respect to any commercial activity which competes, or is reasonably likely

to compete, with any business that the Company conducts, proposes to conduct or demonstrably anticipates conducting."

26. In Section 2(b) of the Agreement, Perkins assigned to Caplight all right, title, and interest in all Inventions, including data, algorithms, know-how, and trade secrets, that he Created during his employment and that arise out of the use of Caplight's assets or relate to any Company Interest. In Section 7, Perkins agreed that his obligations continue after the termination of his employment, that Caplight may communicate those obligations to his future employers, and that he would provide a copy of the Agreement to any potential or future employer.

27. Under Section 8 of the Agreement, because Perkins is not a California resident, disputes "in the meaning, effect or validity of this Agreement" are resolved under Delaware law. Perkins further acknowledged that "any breach or threatened breach of this Agreement will cause irreparable harm to the Company for which damages would not be an adequate remedy" and that Caplight is entitled to injunctive relief "without the necessity of posting any bond."

28. By virtue of his positions as Director of Marketplace Strategy and Vice President of Commercial Products, and his work as a co-inventor of Caplight's data interpolation platform, Perkins had access to, and knowledge of, Caplight's trade secrets. Those trade secrets include, without limitation, the disclosure of the '832 application and the following information, to the extent not disclosed in the '832 application or otherwise generally known to the public (collectively, the "Caplight Trade Secrets"):

(a) **MarketPrice methodology.** The specific weighting parameters, coefficients, reputation-scoring methodologies, and reliability factors Caplight applies to each type, source, volume, and recency of pricing data in calculating Caplight MarketPrice, as documented in Caplight's internal MarketPrice documentation, including the document titled "Caplight MarketPrice-documentation-Aug2023";

(b) **Pricing models.** The source code, model architectures, hyperparameters, kernel selections, and calibration and tuning methods underlying Caplight's Gaussian-process and other pricing models and its confidence-interval computations;

(c) **Data quality controls.** Caplight's outlier-detection and quality-control rules and thresholds;

(d) **Comparables and NLP models.** Caplight's proprietary natural-language-processing models, training data, and clustering methods used to group public comparables and build public company indices;

(e) **Data contributors.** The identities of, terms with, and data-sharing arrangements with Caplight's data contributors, including broker-dealers and institutional investors, and the non-public historical transaction and IOI datasets those contributors provided;

(f) **Business and customer information.** Caplight's non-public product roadmaps, pricing and subscription strategies, customer lists, and customer requirements; the identities of, communications with, and materials prepared for Caplight's clients and prospective clients, including the client-specific materials Caplight maintained for Nomura; and back-testing and performance data showing which methodologies produce accurate prices;

(g) **Option pricing.** Caplight's proprietary methodologies, models, inputs, and outputs for pricing options and other derivative exposures on private-company securities, as reflected in Caplight's internal option pricing materials, including the document titled "Caplight_option_pricing_Sep2023";

(h) **Index construction.** Caplight's non-public methodologies and criteria for selecting, weighting, and rebalancing the constituents of its private-company indices, including the Caplight Liquid 20 index, and its non-public constituent data, as reflected in the document titled "Liquid 20 index constituents";

(i) **Volatility data and models.** Caplight's proprietary private-market volatility datasets, calculations, and methodologies, as reflected in the document titled "Private_market_volatility_20230803";

(j) **Platform and customer data.** The non-public features, design, configuration, and functionality of Caplight's platform, and the customer data displayed in or accessible through it, as captured in the screenshots Perkins took in October 2023;

(k) **Media relationships.** Caplight's compiled contact information for its journalist partners, as reflected in the document titled "Contacts-Journalists";

(l) **Internal knowledge base.** Confidential company information that Caplight maintains in its Notion workspaces; and

(m) **Unpublished inventions.** Unpublished inventions, improvements, data, algorithms, code, and negative know-how developed at Caplight concerning its pricing platform, all of which Perkins assigned to Caplight under Section 2(b) of the Agreement.

29. The Caplight Trade Secrets separately constitute "Proprietary Information" under Section 3(a) of the Agreement, and "Confidential Information" under Section 2(a) of the form Proprietary Information and Inventions Agreement attached to Perkins's offer letter, which defines that term to include, among other things, trade secrets, know-how, product plans, customer lists

and customers, market research, software, formulas, processes, forecasts, and strategies. Caplight will identify the Caplight Trade Secrets with additional particularity, subject to an appropriate protective order, as required by applicable law.

30. The subject matter disclosed in the ’832 application constituted trade secrets prior to the public disclosure of that subject matter through the publication by the United States Patent Office or otherwise.

31. The Caplight Trade Secrets derived and continue to derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, others who could obtain economic value from their disclosure or use. They represent considerable effort and investment by Caplight in research and development and the improper disclosure and use of this information would allow a competitor earlier entry into the market and the ability to replicate Caplight’s pricing capabilities without incurring that cost and time.

32. Caplight has taken reasonable measures to keep the Caplight Trade Secrets secret, including by requiring employees, as a condition of employment, to execute proprietary information and inventions agreements that prohibit the use or disclosure of Caplight’s Proprietary Information and require its return upon termination; notifying departing employees and their new employers of their continuing confidentiality obligations; requiring cybersecurity and privacy training; maintaining nonpublic information behind broker-dealer walls; storing source code in restricted private GitHub repositories; requiring multifactor login for code access, encrypting engineering laptops; requiring data contributors to sign confidentiality agreements; and maintaining confidentiality policies.

**C. Perkins Joins NPM and NPM Launches Tape D**

33. Perkins gave notice of his resignation from Caplight effective November 10, 2023. Upon his resignation, Perkins informed Caplight that he intended to begin working for NPM, a direct competitor of Caplight in the market for private-company pricing data.

34. Following his departure, Caplight performed a forensic review of Perkins' activity on Caplight systems and this revealed that, in the weeks before his departure and while he still owed Caplight duties of loyalty and confidentiality, Perkins engaged in a pattern of conduct directed at acquiring and removing Caplight's confidential information, and concealing these efforts, including the following:

(a) During October 2023, Perkins took 81 screenshots, including screenshots of Caplight's platform and customer data—far more than he had taken in any prior month—despite no change in his job responsibilities that would justify the increase. Given his new role as NPM's Managing Director, Head of Data and Financial Products, Caplight is informed and believes that Perkins captured these screenshots to recreate features and products offered exclusively by Caplight.

(b) On October 27, 2023, Perkins downloaded and then deleted a document titled "Contacts-Journalists," which contains the contact information of Caplight's journalist partners and is proprietary to Caplight. Perkins had no legitimate business need for the document, and his deletion of it evidences an effort to conceal the download from Caplight.

(c) On October 31, 2023, after he had already signed his offer letter with NPM and drafted his notice of resignation, Perkins searched for how to use File Transfer Protocol ("FTP") with Box and immediately logged into Caplight's Box account,

where, as Perkins knew, Caplight stores confidential client contracts and Know Your Customer ("KYC") information.

(d) Also on October 31, 2023, Perkins searched for "can I move a notion article from 1 base to another" and "How to Move Pages Between Workspaces in Notion." Caplight stores confidential company information in Notion.

(e) On November 1, 2023, Perkins downloaded and then deleted from the Downloads folder of his computer a file titled "Caplight_option_pricing_Sep2023," which contains Caplight's highly confidential option pricing information, for which he had no legitimate business reason to access.

(f) On November 1, 2023, Perkins took a screenshot of an email requesting login credentials to Caplight's file server with Morningstar, and then deleted both the screenshot and the email.

(g) On November 1, 2023, his last active day of employment, Perkins downloaded, researched, and used the Intelligent Network Registration search-and-access service, a platform Caplight had not approved for his professional or personal use on his Caplight device, and which, on information and belief, he used to store and move Caplight data to other devices.

(h) On November 1, 2023, Perkins downloaded and then deleted a folder on his desktop titled "Nomura," the name of a Caplight client, which contained at least the files "Caplight MarketPrice-documentation-Aug2023," "Caplight_option_pricing_Sep2023," and "Private_market_volatility_20230803," each containing highly sensitive Caplight information. Perkins's last

communication with Nomura had occurred on September 13, 2023, and he had no legitimate reason to access or delete these files on November 1, 2023.

35. On October 22, 2023, prior to his download of the foregoing confidential information and trade secrets, Perkins drafted a document titled "CIIA_Analysis," in which he identified four clauses of his confidentiality and invention assignment obligations and sought to analyze the consequences to him of violating those clauses.

36. On October 12, 2023, Perkins conducted a series of Google searches, including for "insurance prepaid legal fees," "breach of contract insurance," "professional liability insurance non-compete," "buy contractual liability insurance," and "buy legal dispute insurance," indicating that he anticipated his planned conduct would expose him to legal claims by Caplight.

37. Before returning a second computer that Caplight had purchased for his use, Perkins performed a factory reset of the device, erasing its contents and, on information and belief, concealing evidence of his removal of Caplight property.

38. Perkins' repeated pattern of downloading and then promptly deleting files, and of deleting screenshots and emails, served no legitimate business purpose and evidences his intent to remove Caplight confidential information while concealing his conduct from Caplight.

39. Upon his departure, Perkins did not return, and on information and belief retained, Caplight documents, electronic files, data, and other materials, including the materials described above (the "Caplight Materials"), in violation of Section 3(b) of the Agreement. By letter from its counsel dated November 22, 2023, which enclosed a copy of the Agreement, Caplight demanded that Perkins immediately return any and all of Caplight's confidential and proprietary information, cease and desist from using any of Caplight's confidential information, and sign an affidavit under penalty of perjury attesting to his compliance, and requested a response no later than November

29, 2023. Perkins failed to comply with these demands and has not returned the Caplight Materials.

40. Following his resignation, Perkins began working for NPM November 27, 2023, as Managing Director, Head of Data and Financial Products.

41. On October 31, 2024, NPM publicly launched Tape D®, which it describes as a "premier private market data and market intelligence platform" that generates proprietary pricing data on private companies. *See* https://www.nasdaqprivatemarket.com/news/press-releases/nasdaq-private-market-launches-tape-d-premier-private-market-data-and-market-intelligence-platform/. NPM's launch press release identified Perkins as "Head of Data and Financial Products, Nasdaq Private Market."

42. NPM describes the Tape D Price as "an algorithmic estimate of daily private company share price, produced by an estimator grounded in statistical theory and calibrated on six independent market signals: reported secondary trades, bid/offer history, primary round prices, 409A valuations, mutual fund marks, and historical Tape D estimates."

43. These are the same categories of data—completed transactions, indicative bids and offers, primary rounds, 409A valuations, and mutual fund marks—that Caplight's platform collects, weights, and models. Like Caplight, NPM states that for indicative pricing data "the price is normalized to a 'mid-market' level and used to infer changes in the current valuation of the associated issuer."

44. On June 4, 2025, NPM announced expanded access to Tape D through an application programming interface on Nasdaq Data Link.

45. NPM launched Tape D less than a year after Perkins left Caplight. NPM's development and launch of Tape D in that period, with functionality and methodology mirroring

Caplight's, under the leadership of the same executive who had accessed and downloaded Caplight's MarketPrice documentation, option pricing, index constituent, volatility, and platform materials just prior to departing Caplight, could not have been accomplished without the use of the Caplight Trade Secrets that Perkins acquired at Caplight.

**D. Caplight's Notice to NPM**

46. By copy of Caplight's November 22, 2023 letter to Perkins, Caplight notified NPM, through its Chief Executive Officer, Tom Callahan, and its President, Eric Folkemer, of Perkins's legal obligations to Caplight and of Caplight's belief that Perkins had breached the Agreement. The letter requested that NPM confirm in writing, no later than November 29, 2023, that it was taking all precautions to ensure that no Caplight confidential information was uploaded to its network or used in any manner, and that it did not and would not encourage or participate in Perkins's misconduct. NPM provided no response. NPM therefore had actual knowledge of Perkins's obligations and of Caplight's claims nearly a year before it launched Tape D.

**COUNT I**

**Misappropriation of Trade Secrets Under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. (Against Defendants NPM and Perkins)**

47. Caplight repeats and incorporates by reference each of the preceding paragraphs.

48. Caplight is the owner of the Caplight Trade Secrets, which constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).

49. The Caplight Trade Secrets relate to products and services used in, or intended for use in, interstate and foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1), including Caplight's pricing platform, which is offered to subscribers and data contributors across the United States.

50. Caplight has taken reasonable measures to keep the Caplight Trade Secrets secret, and they derived and derive independent economic value, actual and potential, from not having been or being generally known to, or readily ascertainable through proper means by, others who could obtain economic value from their disclosure or use.

51. Perkins acquired the Caplight Trade Secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use, including under Sections 3(a) and 3(b) of the Agreement and his duties as a Caplight employee. Perkins misappropriated the Caplight Trade Secrets within the meaning of 18 U.S.C. § 1839(5) by acquiring them through improper means—including unauthorized downloads, screenshots, and attempted transfers through Box, Notion, and an unapproved data-transfer service, followed by deletion and a factory reset to conceal his conduct—and by disclosing them to NPM and using them, without Caplight's express or implied consent, to design, develop, calibrate, and market Tape D.

52. NPM misappropriated the Caplight Trade Secrets by acquiring them from Perkins sometime after he joined NPM on November 27, 2023, when NPM knew or had reason to know that they were acquired by improper means, and by using and disclosing them without Caplight's consent when NPM knew or had reason to know that Perkins owed Caplight a duty to maintain their secrecy. NPM had actual notice of Perkins's obligations to Caplight no later than its receipt of Caplight's November 22, 2023 letter, nearly a year before it launched Tape D.

53. Defendants' misappropriation occurred and continued after the May 11, 2016 effective date of the DTSA, including through NPM's ongoing operation, enhancement, and commercialization of Tape D since its October 31, 2024 launch.

54. As a direct and proximate result of Defendants' misappropriation, Caplight has suffered actual loss, and Defendants have been unjustly enriched, in amounts to be proven at trial.

18 U.S.C. § 1836(b)(3)(B). In the alternative, Caplight is entitled to a reasonable royalty under 18 U.S.C. § 1836(b)(3)(B).

55. Defendants' misappropriation was willful and malicious, entitling Caplight to exemplary damages of up to two times the amount of damages awarded and to reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(C)–(D).

56. Defendants' actual and threatened misappropriation has caused and will continue to cause Caplight irreparable harm, and Caplight is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3)(A), including an order prohibiting further use or disclosure of the Caplight Trade Secrets and requiring the return and destruction of all Caplight materials, and, in the alternative, if there are exceptional circumstances that would render an injunction inequitable, a reasonable royalty under 18 U.S.C. § 1836(b)(3)(A)(iii).

**COUNT II**

**Misappropriation of Trade Secrets Under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 et seq.**
**(Against Defendants Perkins and NPM)**

57. Caplight repeats and incorporates by reference each of the preceding paragraphs.

58. The Caplight Trade Secrets constitute trade secrets under the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426.1(d). They consist of formulas, patterns, devices, and compilations of information used in Caplight's business that give Caplight an opportunity to obtain an advantage over competitors who do not know or use them. They are not known outside Caplight, are known within Caplight only to those with a need to know, are protected by extensive measures to guard their secrecy, are extremely valuable to Caplight and its competitors, required substantial effort and money to develop, and could not be properly acquired or duplicated by others without great difficulty.

59. Defendants misappropriated the Caplight Trade Secrets within the meaning of Cal. Civ. Code § 3426.1(b). Perkins, at that time a California resident employed by a California-headquartered company, acquired the Caplight Trade Secrets by improper means and used and disclosed them in breach of the Agreement, and his duty of confidence as a Caplight employee. NPM acquired and used Caplight Trade Secrets on or after November 27, 2023 knowing, or having reason to know, that Perkins disclosed them in breach of his obligations, including after receiving notice of those obligations through Caplight's November 22, 2023 letter.

60. As a direct and proximate result of Defendants' misappropriation, Caplight has suffered damages, and Defendants have been unjustly enriched, in amounts to be proven at trial and recoverable under Cal. Civ. Code § 3426.3(a), including Caplight's actual loss and Defendants' unjust enrichment or, in the alternative, a reasonable royalty under Cal. Civ. Code § 3426.3(b).

61. Defendants' misappropriation was willful and malicious, entitling Caplight to exemplary damages of up to twice any award under Cal. Civ. Code § 3426.3(c) and to reasonable attorneys' fees and costs under Cal. Civ. Code § 3426.4.

62. Caplight has no adequate remedy at law and, under Cal. Civ. Code § 3426.2, is entitled to preliminary and permanent injunctive relief against Defendants' actual and threatened use and disclosure of the Caplight Trade Secrets, affirmative acts to protect the Caplight Trade Secrets, and/or a reasonable royalty.

## COUNT III

### Misappropriation of Trade Secrets Under New York Common Law (Against Defendants NPM and Perkins)

63. Caplight repeats and incorporates by reference each of the preceding paragraphs.

64. The Caplight Trade Secrets constitute trade secrets under New York law. They consist of formulas, patterns, devices, and compilations of information used in Caplight's business that give Caplight an opportunity to obtain an advantage over competitors who do not know or use them. They are not known outside Caplight, are known within Caplight only to those with a need to know, are protected by extensive measures to guard their secrecy, are extremely valuable to Caplight and its competitors, required substantial effort and money to develop, and could not be properly acquired or duplicated by others without great difficulty.

65. Defendants used the Caplight Trade Secrets in breach of an agreement, a confidential relationship, or a duty, or as a result of discovery by improper means. Perkins acquired the Caplight Trade Secrets by improper means and used and disclosed them in breach of the Agreement and his duty of confidence as a Caplight employee, and NPM acquired and used the Caplight Trade Secrets on or after November 27, 2023 knowing, or having reason to know, that Perkins disclosed them in breach of those obligations.

66. As a direct and proximate result of Defendants' misappropriation, Caplight has suffered damages, and Defendants have been unjustly enriched, in amounts to be proven at trial, including Caplight's lost profits and Defendants' unjust gains or, in the alternative, the development costs Defendants avoided through their misappropriation.

67. Defendants' misappropriation was willful, wanton, malicious, and in conscious disregard of Caplight's rights, entitling Caplight to punitive damages.

68. Caplight has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief against Defendants' continued use and disclosure of the Caplight Trade Secrets, affirmative acts to protect the Caplight Trade Secrets, and/or a reasonable royalty.

## COUNT IV

### Misappropriation of Trade Secrets Under the Delaware Uniform Trade Secrets Act, 6 Del. C. c. 20 (Against Defendants Perkins and NPM)

69. Caplight repeats and incorporates by reference each of the preceding paragraphs.

70. The Caplight Trade Secrets constitute trade secrets under the Delaware Uniform Trade Secrets Act, Title 6, Chapter 20 of the Delaware Code, and specifically 6 Del. C. § 2001(4). They consist of formulas, patterns, devices, and compilations of information used in Caplight's business that give Caplight an opportunity to obtain an advantage over competitors who do not know or use them. They are not known outside Caplight, are known within Caplight only to those with a need to know, are protected by extensive measures to guard their secrecy, are extremely valuable to Caplight and its competitors, required substantial effort and money to develop, and could not be properly acquired or duplicated by others without great difficulty.

71. Defendants misappropriated the Caplight Trade Secrets within the meaning of 6 Del. C. § 2001(2). Perkins acquired the Caplight Trade Secrets by improper means and used and disclosed them in breach of the Agreement, and his duty of confidence as a Caplight employee. NPM acquired and used Caplight Trade Secrets on or after November 27, 2023 knowing, or having reason to know, that Perkins disclosed them in breach of his obligations, including after receiving notice of those obligations through Caplight's November 22, 2023 letter.

72. As a direct and proximate result of Defendants' misappropriation, Caplight has suffered damages, and Defendants have been unjustly enriched, in amounts to be proven at trial and recoverable under 6 Del. C. § 2003(a), including Caplight's actual loss and Defendants' unjust enrichment or, in the alternative, a reasonable royalty.

73. Defendants' misappropriation was willful and malicious, entitling Caplight to exemplary damages of up to twice any award under 6 Del. C. § 2003(b) and to reasonable attorneys' fees and costs under 6 Del. C. § 2004.

74. Caplight has no adequate remedy at law and, under 6 Del. C. § 2002, is entitled to preliminary and permanent injunctive relief against Defendants' actual and threatened use and disclosure of the Caplight Trade Secrets, affirmative acts to protect the Caplight Trade Secrets, and/or a reasonable royalty.

**COUNT V**

**Unfair Competition Under New York Common Law**
**(Against Defendants NPM and Perkins)**

75. Caplight repeats and incorporates by reference each of the preceding paragraphs.

76. Defendants, acting in bad faith, misappropriated the results of Caplight's labor, skill, and expenditures, including the Caplight Trade Secrets and Caplight Materials, and exploited them for their own commercial advantage in developing, launching, and marketing Tape D in direct competition with Caplight.

77. As a direct and proximate result, Caplight has suffered damages in an amount to be proven at trial, and is entitled to injunctive relief and, because Defendants acted willfully and maliciously, punitive damages.

**COUNT VI**

**Unjust Enrichment**
**(Against Defendants NPM and Perkins)**

78. Caplight repeats and incorporates by reference each of the preceding paragraphs.

79. Caplight pleads this claim in the alternative to Count VIII with respect to Perkins.

80. NPM was unjustly enriched at Caplight's expense by obtaining and exploiting the Caplight Trade Secrets and Caplight Materials, which allowed NPM to develop and commercialize Tape D without bearing the time and cost of independent development, and to earn subscription and licensing revenue from Tape D.

81. Perkins was unjustly enriched at Caplight's expense by his highly inflated compensation received from NPM, which was based on his disclosure of the Caplight Trade Secrets to NPM for purposes of developing and commercializing Tape D without bearing the time and cost of independent development, and to earn subscription and licensing revenue from Tape D.

82. Each Defendant knew of the benefit it received and has retained without compensating Caplight. Under the circumstances alleged, it would be inequitable and unjust for Defendants to retain those benefits. Equity requires Defendants to make restitution to Caplight and to disgorge the net profits and other gains attributable to their wrongful acquisition, use, and disclosure of the Caplight Trade Secrets and Caplight Materials.

83. The relationship between Caplight and Defendants is sufficiently close, through Perkins's employment at Caplight and NPM's knowing receipt of Caplight's information from him, that equity and good conscience require Defendants to make restitution to Caplight.

**COUNT VII**

**Conversion**
**(Against Defendants NPM and Perkins)**

84. Caplight repeats and incorporates by reference each of the preceding paragraphs.

85. Caplight owns and has an immediate right to possess the Caplight Materials, which are specifically identifiable documents, electronic records, data files, as described above.

86. Defendants, without authorization, assumed and exercised dominion and control over the Caplight Materials to the exclusion of Caplight's rights, including by retaining, copying, and using them at NPM and by refusing Caplight's demand for their return.

87. As a direct and proximate result, Caplight has been damaged in an amount to be proven at trial, and is entitled to punitive damages because Defendants acted willfully and maliciously.

**COUNT VIII**

**Breach of Contract**
**(Against Defendant Perkins)**

88. Caplight repeats and incorporates by reference each of the preceding paragraphs.

89. The Agreement is a valid and enforceable contract between Caplight and Perkins, supported by adequate consideration, including his employment and compensation. Caplight has performed all of its obligations under the Agreement. Perkins breached the Agreement by, among other things:

(i) downloading, screenshotting, and retaining Caplight confidential information without authorization, including the "Caplight_option_pricing_Sep2023" file, the Nomura folder, the "Contacts-Journalists" document, Morningstar credentials, and screenshots of Caplight's platform and customer data, in breach of Section 3(a);

(ii) attempting to transfer Caplight information out of Caplight's Box and Notion systems and through an unapproved data-transfer service, in breach of Section 3(a);

(iii) disclosing and using Caplight confidential information for the benefit of NPM, in breach of Section 3(a); and

(iv) failing to identify and return all Caplight information and retaining copies upon his separation, including after Caplight's November 22, 2023 demand, in breach of Section 3(b).

90. Caplight has been damaged by these breaches and seeks all available remedies under applicable law.

**COUNT IX**

**Breach of Fiduciary Duty**
**(Against Defendant Perkins)**

91. Caplight repeats and incorporates by reference each of the preceding paragraphs.

92. As a high-level fiduciary and employee of Caplight, Perkins owed Caplight a duty of undivided loyalty and good faith. Beginning no later than October 2023 and continuing through the end of his employment on November 10, 2023, while still employed and compensated by Caplight, Perkins secured and accepted an offer from NPM, a direct competitor, and systematically downloaded, screenshotted, and attempted to transfer Caplight confidential information for his own and NPM's benefit, while concealing that conduct through deletions and the factory reset of a Caplight computer. This disloyalty was substantial and related to the performance of his duties.

93. Under applicable law, Perkins is liable for the resulting damages.

**COUNT X**

**Aiding and Abetting Breach of Fiduciary Duty - Duty of Loyalty**
**(Against Defendant NPM)**

94. Caplight repeats and incorporates by reference each of the preceding paragraphs.

95. NPM knew of Perkins's duty of loyalty to Caplight and knowingly induced or substantially assisted his breach, including by extending him an offer of employment, reportedly at up to four times his Caplight compensation, while he remained employed at Caplight; by soliciting and accepting Caplight's confidential information and Caplight Materials for use in developing Tape D; and by continuing to employ him in developing Tape D after receiving notice of his obligations through Caplight's November 22, 2023 letter.

96. Caplight has been damaged as a result in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Caplight respectfully requests that the Court enter judgment in its favor and against Defendants, and grant the following relief:

A. A judgment that Defendants have misappropriated the Caplight Trade Secrets in violation of the DTSA, California Uniform Trade Secrets Act, the Delaware Uniform Trade Secrets Act, and New York common law, and have engaged in unfair competition, unjust enrichment, conversion, breach of contract, breach of fiduciary duty, and aiding and abetting the breach of the duty of loyalty;

B. An award of damages for actual loss and unjust enrichment caused by Defendants' misappropriation, unfair competition, conversion, breach of contract, breach of fiduciary duty, and aiding and abetting the breach of the duty of loyalty, and restitution and disgorgement of Defendants' unjust gains, or, in the alternative, a reasonable royalty;

C. An award of exemplary damages under 18 U.S.C. § 1836(b)(3)(C), Cal. Civ. Code § 3426.3(c), 6 Del. C. section 2003(b), and punitive damages under New York law;

D. A preliminary and permanent injunction prohibiting Defendants from acquiring, using, or disclosing the Caplight Trade Secrets, and requiring Defendants to return to Caplight and destroy all copies of Caplight materials and all materials derived from them;

E. Damages and specific performance for Perkins's breach of the Agreement, and forfeiture of all compensation paid to Perkins during his period of disloyalty;

F. An award of Caplight's reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D), 6 Del. C. § 2004, and Cal. Civ. Code § 3426.4;

G. Pre-judgment and post-judgment interest and costs; and

H. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Caplight demands a trial by jury on all issues so triable.


*/s/ Andrew E. Russell*
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys Plaintiff*

OF COUNSEL:
Kenneth J. Sheehan
ICE MILLER LLP
200 Massachusetts Avenue, NW, Suite 400
Washington, DC 20001
(202) 824-8666
ken.sheehan@icemiller.com

Lesley McCall Grossberg
ICE MILLER LLP
1735 Market Street, Suite 3900
Philadelphia, PA 19103
(215) 377-5007
lesley.grossberg@icemiller.com

Robert D. Keeler
ICE MILLER LLP
1500 Broadway, Suite 2900
New York, NY 10036
(212) 824-4940
robert.keeler@icemiller.com


Dated: November 6, 2026